UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Scott Lubow, | Civil No. 24-1956 (DWF/DJF) |
| Plaintiff, | |
| v. | MEMORANDUM OPINION AND ORDER |
| Sioux Honey Association, Cooperative, | |
| Defendant. | |

## INTRODUCTION

This matter is before the Court on Defendant Sioux Honey Association, Cooperative's ("SHA") motion for summary judgment. (Doc. No. 48.) Plaintiff Scott Lubow opposes the motion. (Doc. No. 57.) For the reasons set forth below, the Court grants the motion.

## BACKGROUND

SHA is a cooperative which produces and sells honey. (Doc. No. 51 ¶¶ 1-2.) SHA sells both brand label and private label honey products. (*Id.* ¶ 2.) Branded products contain 100 percent honey from SHA members and use an SHA brand's label. (*Id.* ¶ 3.) Private label products have the retailer's label and may be mixed with non-SHA honey. (*See id.*; Doc. No. 55-1 at 10.)

Lubow worked for SHA as Vice President of Retail Sales. (*See* Doc. No. 58-1 at 5-6.) His job was to increase sales of both branded and private label products. (Doc. No. 55-1 at 11.) He reported directly to the CEO and President, Kevin Hueser. (*Id.*

at 89; Doc. No. 51 ¶ 1.) Lubow worked for SHA from March 2021 to March 2024, when he was terminated for dishonesty to Hueser. (Doc. No. 58-1 at 6; Doc. No. 55-1 at 24.)

Lubow subsequently brought this suit, claiming that his termination was retaliation for reporting illegal conduct and that his termination violated the Minnesota Whistleblower Act. (*See* Doc. Nos. 1, 15.) Lubow points to three reports of allegedly illegal conduct which he claims were the reason he was terminated.

First, Lubow claims that SHA violated price discrimination laws by offering honey to Costco for a lower price than other retailers. SHA bid for a new sales contract with Costco in February 2024. (Doc. No. 55-1 at 110.) SHA quoted Costco $7.29 per three pounds of private label regional honey. (*Id.* at 93.) Lubow claims this was "significantly" lower than quotes to other retailers.[1] (*Id.* at 112.) Lubow says that he told Hueser the bid was potentially illegal. (Doc. No. 58 ¶ 5; Doc. No. 55-1 at 112.) Hueser does not recall any such conversation. (Doc. No. 55-1 at 48, 51.)

Second, Lubow claims that SHA violated price discrimination laws by refusing to offer private label hot honey to Walmart when other companies were purchasing private label hot honey. In February 2024, Walmart inquired with SHA about purchasing private label hot honey. (Doc. No. 58-1 at 13-14.) Lubow wanted the deal to go through, but Hueser told Lubow that SHA would only sell private label hot honey to Walmart if Walmart also bought branded hot honey. (Doc. No. 55-1 at 21-22.) Hueser's reasoning

---

[1] The only specific example Lubow provides is a quote to Sam's Club for $7.20 per three pounds. (*See* Doc. No. 55-1 at 92, 104, 107; Doc. No. 58 ¶ 5.) That example contradicts Lubow's argument because it is lower than the Costco quote.

was that he was trying to grow branded honey and he wanted SHA brands to be associated with the hot honey. (Doc. No. 51 ¶¶ 2-3.) At the time, SHA had contracts for only private label honey sales, but Hueser was attempting to phase them out. (*Id.* ¶ 5.) Lubow believed that allowing other retailers to purchase only private label honey, but not Walmart, was illegal. (Doc. No. 58 ¶ 12.) Lubow claims he told Hueser about this potential violation of law at a meeting on March 19, 2024. (*Id.* ¶¶ 9, 12.) Hueser says that Lubow never told him it was illegal and that the meeting scheduled for March 19th never occurred. (Doc. No. 51 ¶ 7; Doc. No. 55-1 at 30.)

Third, Lubow claims that the refusal to offer Walmart private label hot honey was also a violation of the Walmart Supplier Agreement (the "Agreement"). The Agreement requires SHA to offer the most favorable terms to Walmart:

> If at a reasonably close point in time with [SHA's] sale of Merchandise to [Walmart], [SHA] sells or offers to any competitor of [Walmart] any merchandise of like grade and quality at lower prices and/or on terms more favorable than those stated on the Order, then, except as prohibited by Law, the prices and/or terms of the Order shall be deemed automatically revised to equal the lowest prices and most favorable terms at which [SHA] shall have sold or shall have offered such Merchandise, and payment shall be made accordingly.

(Doc. No. 58-1 at 34.) Lubow believed that requiring Walmart to purchase both brand label and private label honey, while offering private label honey to some retailers without requiring purchase of brand label honey, was a violation of the Agreement. (*See* Doc. No. 55-1 at 114.) Again, Lubow claims he told Hueser of this violation on March 19th, but Hueser disputes that. (Doc. No. 51 ¶ 7; Doc. No. 55-1 at 30; Doc. No. 58 ¶¶ 9, 12.)

3

Walmart was aware of Hueser's policy and did not contend that SHA's conduct was a violation of the Agreement. (Doc. No. 51 ¶ 6.)

SHA refutes that Lubow was fired for these alleged reports, claiming instead that he was fired for dishonesty to Hueser. Lubow and Director of Sales Erin Peryea engaged Eurpac—a sales, marketing, and distribution group that works with the military—to outsource orders for the Defense Commissary Agency—a grocery commissary for military personnel. (Doc. No. 59 ¶¶ 1, 4, 6, 15.) On February 6, 2024, Lubow signed a letter initiating the brokerage agreement. (Doc. No. 59-1 at 2; *see also* Doc. No. 52 ¶ 7 (explaining that it was only the first step in the transition to Eurpac).) While Hueser had known that engaging Eurpac was an option since January, he was not aware that Lubow signed the letter until March 14th. (Doc. No. 51 ¶ 11; Doc. No. 55-1 at 20.) Lubow did not inform Hueser of the signed letter earlier, despite Peryea's insistence that Hueser should know. (Doc. No. 52-1 at 25; Doc. No. 52-2 at 14, 30.) On Hueser's first day back in the office after learning about the letter, Hueser confirmed that the letter was signed and made the decision to fire Lubow due to the dishonesty. (Doc. No. 51 ¶ 12; Doc. No. 55-1 at 25.) Lubow was fired later that same day. (Doc. No. 51 ¶ 12.)

## DISCUSSION

### I.    Legal Standard

Summary judgment is proper if the moving party shows that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). A party opposing a properly supported motion for summary judgment must demonstrate the

existence of specific facts in the record that create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Weitz Co. v. Lloyd's of London*, 574 F.3d 885, 892 (8th Cir. 2009).

**II.     Analysis**

The Minnesota Whistleblower Act ("MWA") prohibits retaliation by an employer against an employee because the employee "in good faith, reports a violation, suspected violation, or planned violation of any [law] to an employer or to any governmental body or law enforcement official." Minn. Stat. § 181.932 subdiv. 1(1) (2025). Retaliation claims under the MWA may be proven by direct evidence or under the *McDonnell Douglas* burden-shifting framework. *Wood v. SatCom Mktg., LLC*, 705 F.3d 823, 828 (8th Cir. 2013). *See generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973) (discussing burden shifting in the Title VII context). Because Lubow has no direct evidence, his claims are considered under the *McDonnell Douglas* framework. Under this test, the employee must first establish a prima facie case of retaliation. *Wood*, 705 F.3d at 829. If the employee can establish a prima facie case, the burden of production shifts to the employer to articulate a legitimate, non-retaliatory reason for its action. *Id.* If the employer meets its burden of production, the employee must demonstrate that the employer's articulated justification is pretextual. *Id.*

An employee establishes a prima facie case of retaliation by showing that: "(1) he engaged in protected conduct, (2) he was subjected to an adverse employment action, and

5

(3) there was a causal connection between the protected conduct and the adverse action." *Scarborough v. Federated Mut. Ins. Co.*, 996 F.3d 499, 505 (8th Cir. 2021); *accord Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 444 (Minn. 1983). Failure to establish any of these elements warrants summary judgment in favor of the employer. *E.g.*, *Moore v. City of New Brighton*, 932 N.W.2d 317, 323 (Minn. Ct. App. 2019).

Relevant here, a good faith report of a violation of law or suspected violation of law is statutorily-protected conduct. Minn. Stat. § 181.931 subdiv. 6 (2025) (defining "report" as "a verbal, written, or electronic communication by an employee about an actual, suspected, or planned violation of a statute, regulation, or common law, whether committed by an employer or a third party"). The reported behavior need not be an actual violation of law, but the alleged facts, if proven, must constitute a violation of law. *Abraham v. County of Hennepin*, 639 N.W.2d 342, 354-55 (Minn. 2002); *see also Kratzer v. Welsh Companies, LLC*, 771 N.W.2d 14, 22 (Minn. 2009) ("[A] mere report of behavior that is problematic or even reprehensible, but not a violation of the law, is not protected conduct under the Whistleblower Act."). Therefore, the Court accepts the reported facts as true and then determines if those facts constitute a violation of law. *Kratzer*, 771 N.W.2d at 22.

Lubow points to three reports to satisfy the protected-conduct element: (1) the report of illegal price discrimination in the Costco bid, (2) the report of illegal price discrimination for the Walmart hot honey deal, and (3) the report of violation of the Agreement for the Walmart hot honey deal. (*See* Doc. No. 57 at 22.) As explained

below, he fails to establish that any of these reports are protected conduct because none of the reported behavior is a violation of law.

### A.     Price Discrimination

The Robinson-Patman Act ("RPA") prohibits "discriminat[ion] in price between different purchasers of commodities of like grade and quality . . . where the effect of such discrimination may be substantially to lessen competition." 15 U.S.C. § 13(a).  Lubow has not provided sufficient evidence of illegal conduct for either alleged RPA violation.

First, regarding the Costco bid, he only points to one example of price discrimination—the Sam's Club quote, which was lower than the Costco quote.[2]  Lubow claims that other retailers were offered higher prices, but did not point to any specific evidence that proves that.  *See generally Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990) (discussing Rule 56's requirement for more than general allegations in affidavit form).  Second, there is no evidence in the record of any impact on competition for either deal.  And, regardless, a single instance does not rise to the level of "substantial."  Lubow points only to one instance allegedly impacting Costco and one instance allegedly impacting Walmart.  *See Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 179-80 (2006) (finding that only two instances of competition were not enough to show substantial impact).

---

[2]     Even if the Sam's Club quote was higher, Sam's Club did not buy regional honey, so any price discrepancy would not be relevant because it was a different product. (*See* Doc. No. 55-1 at 51.)

7

Further, even if there were sufficient evidence, neither action would violate the RPA because neither was a final purchase. *See Sioux City Truck & Trailer Inc. v. Ziegler, Inc.*, No. 16-cv-4106, 2016 WL 7106519, at *4 (N.D. Iowa Dec. 5, 2016) ("[T]he court views the RPA as requiring a plaintiff to actually purchase a commodity at a purportedly discriminatory price to state a claim for price discrimination."). The Costco bid was just that—a bid, not a final deal. *See Fusco v. Xerox Corp.*, 676 F.2d 332, 337 (8th Cir. 1982) ("Mere offers to sell are not sufficient."). The Walmart hot honey deal was merely a refusal to offer. *See B-S Steel of Kan., Inc. v. Texas Indus., Inc.*, 439 F.3d 653, 669 (10th Cir. 2006) ("It is well established that a refusal to deal simply does not fall within the proscription of section 2(a) of the Robinson-Patman Act." (citation modified)). Conduct that was merely contemplated, even if the conduct would have been illegal if the employer followed through, is not a violation of law. *Grundtner v. Univ. of Minn.*, 730 N.W.2d 323, 329 (Minn. Ct. App. 2007) (affirming summary judgment on MWA claim, in part, because the conduct was merely contemplated, not consummated).

### B.   Breach of Contract

Lubow also points to a report of an alleged breach of the Agreement as statutorily-protected conduct. A breach of contract can be the basis of an MWA claim. *Moore*, 932 N.W.2d at 324-25. However, there was no breach of contract here; the refusal to offer private label hot honey was not a violation of the Agreement.

The Agreement mandates that if SHA offers merchandise of like grade and quality at either a lower price or better terms to another customer, then Walmart's order will be automatically revised to the more favorable price or terms. (Doc. No. 58-1 at 34.) This

8

provision is only implicated if Walmart has already made a purchase order with SHA for the relevant product. It would be impossible to revise an order if there was no purchase by Walmart. Here, Walmart was interested in ordering hot honey but had never purchased hot honey from SHA. Therefore, there was no order to revise, and the relevant section of the Agreement was not implicated.

There is no basis for the Court to find a violation of the RPA or the Agreement. Therefore, any report of such behavior would not be protected conduct because there was no violation to report. Lubow has failed to establish a prima facie case of retaliation. The Court's analysis ends here.[3] *See Kratzer*, 771 N.W.2d at 22-23 (holding that summary judgment is appropriate when a plaintiff fails to establish a violation of law and, therefore, fails to establish that he engaged in statutorily-protected conduct). Summary judgment in favor of SHA is warranted.

---

[3] Even if the Court continued the analysis, Lubow's claims would still fail because he has not established that SHA's reason for his termination was pretextual. *See Hamblin v. Alliant Techsystems, Inc.*, 636 N.W.2d 150, 153 (Minn. Ct. App. 2001) (requiring a plaintiff to prove that the "employer's proffered explanation is unworthy of credence," absent discriminatory intent). Lubow has not shown discriminatory intent. Additionally, the Court finds that SHA's reason for termination, the dishonesty surrounding the Eurpac deal, was an honest explanation. SHA produced ample evidence of Lubow's concealment regarding the Eurpac letter, and it is not the Court's place to decide if such concealment was worthy of termination. *See Aulick v. Skybridge Ams., Inc.*, 860 F.3d 613, 622 (8th Cir. 2017) ("[Courts do not] sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination." (citation modified)).

## CONCLUSION

Plaintiff Scott Lubow has failed to establish that Defendant Sioux Honey Association, Cooperative violated the Minnesota Whistleblower Act. Lubow has the burden to establish that he engaged in statutorily-protected conduct. Because he cannot establish that even the facts as alleged would constitute a violation of law, he has failed to meet that burden. The Court grants SHA's motion for summary judgment.

## ORDER

Based upon the foregoing and the record in this case, **IT IS HEREBY ORDERED** that:

1. Defendant Sioux Honey Association, Cooperative's motion for summary judgment (Doc. No. [48]) is **GRANTED**.

2. Plaintiff Scott Lubow's claims (Doc. No. [15]) are **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  February 3, 2026                s/Donovan W. Frank
                                        DONOVAN W. FRANK
                                        United States District Judge